UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

IN THE MATTER OF THE SEARCH OF          )
INFORMATION ASSOCIATED WITH             )     No. 1:20MJ4067ACL
FACEBOOK USER ID **100011385979104**    )
THAT IS STORED AT PREMISES              )     FILED UNDER SEAL
CONTROLLED BY FACEBOOK, INC.            )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Timothy Miller, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant pursuant to

18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) and Federal Rule of Criminal Procedure

41 for information associated with a certain Facebook user ID that is stored at premises owned,

maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking

company headquartered in Menlo Park, California.  The information to be searched is described

in the following paragraphs and in Attachment A.  The requested warrant would require

Facebook to disclose to the United States records and other information in its possession,

pertaining to the subscriber or customer associated with the user ID as further described in

Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms &

Explosives (hereinafter "ATF") and have been employed as such since November 8, 2016.  I

have a Bachelor of Science degree in Psychology from Southeast Missouri State University and

have received approximately 27 weeks of advanced law enforcement training at the Federal Law

Enforcement Training Center in Glynco, Georgia.  Prior to my employment with ATF, I was a

Police Officer in the City of Cape Girardeau, Missouri for 5 years.  I also served in the United

1

States Army and Missouri Army National Guard as a Military Police Officer. I have performed Military Police duties in Europe, Afghanistan and the Continental United States. I also performed combat engineer route clearance missions in Iraq in support of Operation Iraqi Freedom during 2005 and 2006.  My principal duties as a Special Agent with ATF include conducting criminal investigations into cases of illegal possession/transfer of firearms, firearms trafficking, and violent crimes involving firearms and narcotics trafficking.  Among other activities, I have participated in operations using confidential sources and undercover law enforcement officers, debriefed witnesses and confidential sources.  I have also utilized GPS location, social media and mobile device information to advance investigations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      This application relates to an ongoing investigation into the Gangster Disciples national street gang, including in particular **Dominque MAXWELL**, aka "DMac," a state level leader in the organization and the user of the social media account that is the subject of this affidavit.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1962(d) (Racketeering Conspiracy) have been committed by **MAXWELL** and others. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

### JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### LOCATION TO BE SEARCHED

6.     The location to be searched is Facebook account number **100011385979104** (hereinafter the "Subject Account"), used by **Dominque MAXWELL**, located at 1601 Willow Road, Menlo Park, CA 94025, further described in Attachment A. The items to be reviewed and seized by the United States are described in Part II of Attachment B.

### BACKGROUND RELATING TO FACEBOOK

7.     The Internet is in part a computer communications network using interstate and foreign telephone and communication lines to transmit data streams, including data streams used to provide a means of communication from one computer to another and used to store, transfer and receive data and image files.

8.     An "Internet Protocol" (IP) address is a unique series of numbers, separated by a period, that identifies each computer using, or connected to, the Internet over a network. An IP address permits a computer (or other digital device) to communicate with other devices via the Internet. The IP addresses aids in identifying the location of digital devices that are connected to the Internet so that they can be differentiated from other devices. As a mailing address allows a sender to mail a letter, a remote computer uses an IP address to communicate with other computers.

3

9.     An "Internet Service Provider" (ISP) is an entity that provides access to the Internet to its subscribers.

10.     The term "remote computing service" means the provision to the public of computer storage or processing services by means of an electronic communications system.

11.     Facebook is a business and company that operates as a remote computing service, a provider of electronic communications services through ISPs.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

12.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

13.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and administrator, as well as the current status of the group profile page.

14.     A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

15.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s). Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

16.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

17.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them. Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  Facebook allows users to edit or delete comments on their own profile pages, and users can adjust their profile settings to allow them to pre-approve comments on their own profile pages.

18.     In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

19.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

20.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

21.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

22.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

23.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

24.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

25.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

26.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date),

the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. When a given Facebook account is deleted, Facebook retains certain information relating to that account for some period of time, including user identity information, IP logs, and other data. Even if a given user deletes data, Facebook stores such data for extended periods of time on Facebook's servers.

27.     Messages, photos, audio videos, and other records stored on Facebook server by a subscriber may not necessarily be located in the subscriber's home/work computer. The subscriber or user may store data on Facebook servers for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer at his/her residence or employment. A search of the files in the computer at the subscriber's residence or place of employment will not necessarily uncover the files that the subscriber has stored on the Facebook server. Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

28.     By their very nature, websites, social networking accounts, and internet-based applications described herein are kept and stored in computers and electronic-memory devices by the host companies, in addition to or in lieu of hard-copy versions of this data. Because such

evidence is stored electronically, the data and evidence of the crimes described herein may be stored and be present for long periods of time.

29.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

30.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus helping the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, will likely indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-

location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

## PROBABLE CAUSE

### *The Gangster Disciples Enterprise*

31.     Based upon my training and experience, discussions with other law enforcement officers, review of prison records including intelligence reports and recorded inmate calls, physical and electronic surveillance, interviews of witnesses, and other means, I know the following about the Gangster Disciples:

32.     The Gangster Disciples are a highly organized gang with national reach, and are presently active in more than 35 states.

33.     The gang enforces a highly structured chain of command.  The top leader and founder of the Gangster Disciples is Larry Hoover, who is now serving a life sentence in federal prison but is still revered by all members.  Under Hoover is a small cadre of "Board Members", who have authority over Gangster Disciples nationwide.  Below the Board Members, "Governors-of-Governors" hold authority over multi-state regions, and "Governors" command individual states.  Below Governors are, in descending order of authority, "Assistant Governors," "Regions" or "Regents," and "Coordinators."  A parallel leadership structure exists within the

prison system, with heads of particular correctional facilities referred to as "Institutional Coordinators."

34.     Gangster Disciples members have been investigated and prosecuted for a wide range of federal and state offenses, including federal firearms offenses; drug trafficking; extortion; robbery; mail, wire, and bank fraud; and murder. The crimes typically committed by Gangster Disciples members include many of the "racketeering activities" specified in 18 U.S.C. § 1961(1), and the gang has been the subject of multiple major racketeering cases in recent years. The crimes committed by Gangster Disciples members are often inextricably linked with membership in the gang. For example, by belonging to the organization members gain access to a network of drug suppliers. Violent crimes, including murder, frequently occur as punishment for perceived disloyalty by members, or as retaliation for perceived disrespect by rival gangs.

35.     The Gangster Disciples protect their power and reputation by means of threats, intimidation, and violence, including murder, assault, and obstruction of justice. Gangster Disciple leaders and members are aware that the gang is known to law enforcement, and they take steps to protect their criminal activities from detection and prosecution. In particular, the gang enforces a rule known as "Silence and Secrecy", which holds that cooperation with law enforcement is strictly forbidden. Gangster Disciple leaders have also been known to take steps to evade electronic surveillance, such as regularly changing phone numbers and insisting on face-to-face meetings for the discussion of serious criminal activity.

36.     There is probable cause to conclude that the Gangster Disciples are an "enterprise" whose members engage in a "pattern of racketeering activity," as those terms are defined in 18 U.S.C. § 1961.

## *Investigation of Dominique MAXWELL, Gangster Disciple Assistant Governor of Missouri*

37.     Investigators have identified **Dominique MAXWELL,** as the Assistant Governor of the Gangster Disciples for the State of Missouri and the user of the Subject Account.  Law enforcement believes **MAXWELL** currently resides in Cape Girardeau, Cape Girardeau County, Missouri and law enforcement has confirmed he is employed in Cape Girardeau, Missouri.  In particular:

a.  I have listened to numerous recorded jail calls from Missouri Department of Corrections (MDOC) inmates to **MAXWELL.**

b.  On one call in August of 2018, **MAXWELL** told an incarcerated Gangster Disciple member that he was the "Assistant" for Missouri.  On another call several days later, **MAXWELL** told another incarcerated Gangster Disciple member that he was "the Assistant G out here, so . . . everything pretty much gonna get ran through me."

38.     Apart from helping to lead the Gangster Disciples racketeering enterprise, **MAXWELL** is also believed to have participated directly and personally in multiple racketeering acts.  For example:

a.  ATF has identified **MAXWELL** as a key participant in a gang-related murder that occurred on April 28, 2018, during a Gangster Disciples meeting in a park in Bridgeton, MO.  In particular ATF has learned that:

i.  A Gangster Disciples member named Dushawn Wharton was, at the time of the murder the Governor of Missouri, but was having his position challenged by a rival faction within the organization.  Wharton refused to

12

step down from the Governor position and was confronted by rivals during the Bridgeton meeting.

ii. An eyewitness present at the meeting stated to ATF that **MAXWELL** was present at the meeting and was acting as a conduit for Gangster Disciples Board Member, Frank Smith, whom conveyed an order over **MAXWELL**'s phone telling the Gangster Disciples loyal to Smith to shoot Wharton.  Gunfire broke out after Smith's order.  Approximately seventy-two (72) shell casings were recovered by law enforcement from the crime scene.  The shooting left Wharton and another Gangster Disciples member non-fatally wounded.  A third Gangster Disciples member, Leroy Allen, was killed in the gunfire.  The witness identified **MAXWELL** and Gangster Disciple Governor of Missouri Sean Clemon as being present at the shooting.[1]

---

[1] This witness is an occurrence witness and not a confidential informant.  The witness, believed to be a member of the Gangster Disciples, relayed that he/she knew the purpose of the meeting, that being an arranged meeting of the Gangster Disciples members to discuss the removal of Dushawn Wharton as the Governor of Missouri Gangster Disciples.  The witness voluntarily arrived with other known GD members.  I know through my knowledge and experience in this case that non-GD members would not be allowed to attend this meeting nor would they have the intimate knowledge or know the specific purpose of this meeting without being a member of the Gangster Disciples.  The witness can be considered reliable as several facts provided in the witness' description of events were ultimately corroborated by non-public evidence obtained by law enforcement.  The witness identified MAXWELL, Clemon and other Gangster Disciple members from surveillance photographs obtained from a nearby gas station a few hours prior to the shooting.  Law enforcement also identified MAXWELL and Clemon from these same photographs.  The witness described a phone call made from MAXWELL'S phone to F. Smith.  Law enforcement obtained toll records and phone location information for identifying this call and the location of the phone during this call.  The location of the phone matched the location described by the witness.  It is believed that the witness's motivation is that of seeking justice for the homicide victim.  The witness' relevant criminal history includes a 2002 conviction for

b.   On June 3, 2018, a shooting occurred in Cape Girardeau, MO, that left one victim non-fatally wounded.  ATF reviewed surveillance video from the scene showing **MAXWELL** and two other known Gangster Disciples firing handguns.  Shell casings from that scene were forensically analyzed, and some of the casings were found to match casings recovered from the April 2018 murder in Bridgeton, MO.

c.   Investigators learned via jail calls that Gangster Disciples in the Missouri Department of Corrections (hereinafter "MDOC") were conspiring to smuggle drugs into the prison via the mail service.  Prison staff successfully intercepted a package addressed to one of the conspirators and found it to contain a controlled substance known as K2, a synthetic cannabinoid.  On the jail calls discussing the scheme, the apparent sender of the drugs explains that he was in contact with **MAXWELL** about the scheme and that **MAXWELL** wanted him to "reach out to all the areas [prisons]" to develop a drug network.

39.   Based on the foregoing, there is probable cause to believe that **MAXWELL** is a leader of the Gangster Disciples enterprise, that he has engaged in violent racketeering acts including murder on behalf of the enterprise, and that he continues to engage in the gang's racketeering activities including smuggling controlled substances into correctional facilities.

### *MAXWELL's Facebook Activity*

40.   The Subject Account has been identified as belonging to **MAXWELL**.  I first became aware of **MAXWELL** in May of 2018, shortly after learning about his involvement in the Bridgeton, Missouri homicide.  Since that time, I have observed **MAXWELL** during covert

---

Robbery, 2011 violation of a protection order for an adult, and various misdemeanor and traffic offenses.

surveillance operations, on multiple occasions. I have reviewed the publicly available content for the Subject Account. The Subject Account, which uses the name "D Mac Maxwell," displays a profile picture of an individual I recognize to be **MAXWELL**, atop a motorcycle. I know **MAXWELL** to be an avid motorcycle enthusiast. **MAXWELL**'s account also displays a birthday of May 19th. I know **MAXWELL**'s date of birth is May 19, 1992.

41.     An ATF Confidential Informant (hereinafter "CI-1") has provided consensual access to his/her Facebook account.[2] I have reviewed the "D Mac Maxwell" Facebook Subject Account from CI-1's Facebook account, including messages and content, and have determined that **MAXWELL** is using the Subject Account to conduct the business of the Gangster Disciples enterprise.

---

[2] ATF has been actively investigating Gangster Disciple activity in the Southeast Missouri region and beyond since September 2017. CI-1, approached ATF with information reference to Gangster Disciple activity in 2017. Over the course of this investigation CI-1 has provided information about Gangster Disciple members that has been corroborated by investigative means and sources to include, but not limited to: analysis of telephone toll records and pen registers, confirmation of recorded and/or monitored calls in which CI-1 participated, review of undercover audio and video recordings of Gangster Disciple meetings attended by CI-1 and review of undercover audio and video of recordings made by the investigative team during controlled purchases made by CI-1. CI-1 has also provided information that has been found to be false or misleading over the course of this investigation. Therefore any information provided by CI-1 is heavily scrutinized and only considered reliable after validation through other means and sources. In this affidavit ATF is not relying on information provided by CI-1. Instead ATF was given consensual access to the Facebook account of CI-1 and law enforcement has independently reviewed all the information contained in this affidavit related to the Subject Account via access from the CI-1's Facebook Account. CI-1's relevant criminal history includes a 1991 felony conviction for distribution of a controlled substance, a 1997 felony conviction for aggravated robbery and robbery, a 1997 a felony conviction for distribution of a controlled substance and a 2004 felony conviction for nonsupport in excess of $5,000.00. CI-1 is seeking and receiving subsistence for his/her cooperation.

42.     During the month of February 2020 I reviewed the Subject Account on numerous occasions.  My review of the Subject Account revealed that **MAXWELL** has been using the Subject Account to further the Gangster Disciple enterprise since at least November of 2017.  On February 27, 2020, I served a preservation request on Facebook for **MAXWELL**'s Facebook account to prevent the deletion of the records that are the subject of this application.  I therefore believe that the requested records still exist on Facebook's servers.

43.     I observed a "shared" post, created by a different Facebook user account, that **MAXWELL** "shared" on November 22, 2017.  The "shared" post contains a photograph of Larry Hoover with a captioned comment, which states, "Growth and Development #theyforgot." I know through my knowledge and experience in this investigation that Gangster Disciple members often use the words "Growth and Development" to describe gang activities.  I also know that Larry Hoover is the founder of Gangster Disciples and is often revered by its members.

44.     I reviewed the Subject Account for the time period of the Bridgeton murder (April 2018) and the Cape Girardeau shooting (June 2018) and discovered that MAXWELL was using the Subject Account to further Gangster Disciple activities.

45.     I observed a post "shared" by the user of the Subject Account on April 10, 2018. The post, originally created by another Facebook user and subsequently "shared" by the Subject Account user, stated: "On the real a lot of you guys should really thank the old man he saved a lot of you clowns with the 720."  The user of the Subject Account captioned the "shared" post with a comment, which stated "Facts", with accompanying caricatures, commonly referred to as "emojis."  I know based on my experience in this investigation that the original creator of the above-described post is a member of the Gangster Disciple Organization.  I also know that

16

Gangster Disciple members often refer to the group's founder, Larry Hoover, as "the old man." Further, I know from experience in this investigation that "the 720" is a reference to an ideological change that Hoover has attempted to implement into the organization.

46.     I observed a post from MAXWELL on the Subject Account on July 4, 2018. The post contained three different pictures.  One of the pictures was a picture of MAXWELL, commonly referred to as a "selfie." Another one of the pictures was of a hand making an L sign with the words, "L's Up." The final picture just contained the phrase "PLENTY MUCH LOVE TO ALL STRUGGLERS." The post was captioned by MAXWELL "Happy Fourth of July." I know based on my experience in this investigation that "L's up" and "Plenty Much Love" are common phrases used by members of the Gangster Disciple organization.

47.     During my review of the Subject Account I observed a recent post added to the page.  An image, which is a photograph of a grey T-shirt with the phrase "I was taught to think before I act, so if I smack the shit out of you, rest assured – I've thought about it, and am confident in my decision" is captioned by the words, "How I'm feeling this morning." The post was placed on the "wall" of the profile by the user, "D Mac Maxwell" on February 12, 2020, indicating that **MAXWELL** is actively utilizing the account.

48.     A review of the CI-1's Facebook account has revealed that **MAXWELL** is using the Subject Account to send and receive messages to and from a group of Gangster Disciple members.  The "Group Chat" is named "Brotherhood" and I have identified multiple participants in the "Brotherhood" group as active Gangster Disciples.  Facebook indicates that **MAXWELL** is the "administrator" of the group chat.  I have reviewed a portion of the "Brotherhood" group chat and observed many messages from **MAXWELL**.  In particular, I observed a January 28, 2020 interaction in which **MAXWELL** used the "Brotherhood" group chat to announce that he

17

levied a fine against a subordinate member, Barry Boyce.  Those messages, among other responses, included the following messages from **MAXWELL** and Boyce:

    a.  **MAXWELL**: @Barry Boyce you got a fine…for 200 for not checking in or out

    b.  Boyce: I'm here everyday

    c.  Boyce: You not paying attention

    d.  Boyce: I don't have responded to what y'all speak on you see me on here

    e.  **MAXWELL**: You was just in New Orleans was you not

    f.  Boyce: You didn't know

    g.  Boyce: I talk to pops (Affiant's note: "Pops" is a reference to Sean Clemon, **MAXWELL**'s Gangster Disciple superior)

    h.  **MAXWELL**: And he ain't nobody

    i.  **MAXWELL**: That's breaking coc (Affiant's note: "COC" is reference to Chain of Command)

    j.  Boyce: Not really

    k.  Boyce: Long as you report it

    l.  **MAXWELL**: Nope you got to follow coc so With that being said that's a fine (Affiant's note: **MAXWELL** is notifying Boyce that Boyce has broken chain of command by reporting his location to Clemon ("Pops) and **MAXWELL** is therefore assessing an additional fine for that infraction).

49.    I reviewed the remaining conversation in the "Brotherhood" Group Chat.  It should be noted that **MAXWELL** ultimately decided to waive Boyce's fine and elected instead to serve Boyce with a "write up" for violating chain of command.  I know from experience in this investigation, that Gangster Disciple members must adhere to a strict code of conduct.  If a

18

member is found to have violated the code of conduct then leaders of the gang can initiate a punishment against the member, including a fine, a "write up" or other punishment.  Moreover, I know that only Gangster Disciples members holding a leadership position within the enterprise have the authority to waive punishment and a fine.

50.     I know from experience in this investigation, that it is common practice for Gangster Disciple members to "check in" when they leave their own jurisdiction and travel to another.  During my review of the "Brotherhood" Group Chat, I observed that another known Gangster Disciple, Shawn Mahler a/k/a "Whitefolks," sent a message to the group on January 28, 2020, which stated the following: "It's been security protocol for years to check in with your COS (Affiant's note: "COS" is a reference to the Gangster Disciple position of authority "Chief of Security), or whoever he designates you to report too on his staff, and then for him to contact security, COS, of the area you're traveling to as far in advance as possible!  That way we know where u at if something happens!  Other areas are then held accountable if something happens to you, etc!"

51.     Information obtained via consensual review of the ATF Confidential Informant's Facebook account has been corroborated using documentary evidence.  On October 7, 2019, ATF obtained a "pen trap" order requiring Facebook provide certain non-content details about the use of Facebook's messaging features by **MAXWELL**'s account.  The data supplied by Facebook shows the date and time of any message sent or received by **MAXWELL**'s account, as well as the Facebook IDs of all parties to those messages.  ATF has subsequently received renewed authorization for the aforementioned "pen trap" on December 6, 2019 and February 4, 2020.  I have reviewed the pen-trap data and learned the following:

　　　　a.  **MAXWELL** is an active user of Facebook's messaging services.

b. Pen-trap data confirms that **MAXWELL** has utilized Facebook's messaging service since at least October 7, 2019, to communicate with his Gangster Disciple subordinates via the "Brotherhood" group chat.

c. The pen-trap data confirms the accuracy and legitimacy of the information learned from the consensual review of the ATF Confidential Informant's account. The pen-trap data shows that the messages consensually viewed from ATF Confidential Informant's account were, in fact, sent and received by the Target Account.

d. Apart from the messages involving ATF Confidential Informant, the pen-trap shows that **MAXWELL** is using Facebook in other ways relevant to this investigation.  In particular, the pen-trap shows that **MAXWELL** is separately corresponding with accounts that, based on the account usernames, appear to belong to known Gangster Disciples leaders.  For example, on January 28, 2020, **MAXWELL** sent a group message to accounts with the names "Sean Scott Clemon," "Daryl Wheeler," "Jerret Santure," and "Frank Smith." In addition on March 4, 2020, **MAXWELL** sent a private message to "Sean Scott Clemon." The investigation has revealed Clemon to be the gang's "Governor" in charge of Missouri, Wheeler to be "Governor-of-Governors" over multiple Midwest states, and Smith to be a "Board Member" with national authority.

52.    On January 28, 2020, **MAXWELL** received a call from Sean Clemon, the Gangster Disciple Governor of Missouri and Maxwell's superior within the gang.  That call was lawfully intercepted and recorded by ATF.  I listened to the call and heard the following:

20

a. **MAXWELL** and Clemon are discussing gang business, as shown by their frequent use of Gangster Disciples terminology such as "POA" ("Position of Authority," or gang leadership position) and "studying your lit" (referring to "literature," and the gang's expectation that members become knowledgeable about the group's history and teachings); and references to the gang's "creed" and the appropriate punishments if a member cannot recite the creed. Clemon also expressly uses the acronym "GD" twice.

b. **MAXWELL** and Clemon are specifically discussing a problem involving a Gangster Disciple member known as "Spike."

c. In the course of discussing the problem with Spike, Clemon makes an apparent reference to the Facebook group chats sent by **MAXWELL**, discussed above. Clemon repeatedly instructs **MAXWELL**: "[t]ake him outta that group chat, take him outta the group chat so he won't have nothing to motherfucking trip about . . . Take him out. Take him out." As stated above, only one of the participants in **MAXWELL**'s group messages has the nickname "Spike", namely Mike "Spike" G. Smith. Affiant is familiar with a subject named "Spike" who is a GD member from the Charleston, Missouri area. Investigators know that "Spike" and "Spike G" are one and the same individual.

53.    Based on the pattern of group messaging and the phone call between **MAXWELL** and Clemon, there is probable cause to conclude that **MAXWELL** is using Facebook to conduct the affairs of the Gangster Disciples.

54.    On February 18, 2020, ATF Special Agents interviewed Perry Harris, a known Gangster Disciple associate and friend of **MAXWELL**. Harris confirmed that he, Clemon,

21

MAXWELL and others were present at the April 28, 2018 shooting incident in Bridgeton, Missouri. The ATF Special Agents questioned Harris about that incident and also questioned Harris about he and MAXWELL's involvement in the Gangster Disciple organization. On February 19, 2020, I reviewed the aforementioned "Brotherhood" group chat and observed that MAXWELL had appointed Harris as the "administrator" of the "Brotherhood" group chat and subsequently left the group chat. Timestamps on the group chat indicate MAXWELL left the group chat on February 18, 2020.

55.     From my knowledge, training and experience, as well as discussions I have had with other agents and personnel familiar with computer-related investigations, I know that it is common for individuals engaged in the criminal activities described herein to use social networking sites such as Facebook to communicate with one another and facilitate their criminal activities. Such communications and the facilitation of criminal activities include the use of these applications and electronic and stored data that would identify and describe: (a) other co-conspirators, aiders, and abettors who are participating in the illegal activities as well as the nature and scope of the illegal activities; (b) identify dates and locations where illegal activity has taken place or may take place in the future; (c) discussions concerning planning, operations, the transfer of information, concerning the illegal activities described herein as well as sharing photographs, videos, documents, and files; (d) financial transactions and monetary transfers used to facilitate and continue criminal activities as well as the existence and location of records, bank accounts, and businesses pertaining to those activities; (e) sales and purchases of equipment, materials, and goods used to aid the co-conspirators in their endeavors as well as the location and use of assets accumulated; (f) travel, safe-houses, and locations where goods, materials and personnel stay or are kept; and (g) the existence of other communication facilities, including

22

telephones, computers, e-mail and other electronic accounts used to by co-conspirators to communicate.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

56.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the United States copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, United States-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

57.     Based on the forgoing, I request that the Court issue the proposed search warrant. The United States will execute this warrant by serving the warrant on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

58.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

59.     I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution,

destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Timothy Miller
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives

Subscribed and sworn to before me on _____ March   10 _____, 2020

The Honorable Abbie Crites-Leoni
UNITED STATES MAGISTRATE JUDGE

24

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook account(s) and/or user ID(s) 100011385979104 that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company located at 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f),

Facebook is required to disclose, from April 1, 2018 to July 15, 2018 and from October 7, 2019 to March 4, 2020, the following information to the government for the account(s) and user ID(s) listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)    All profile information; news feed information; status updates; videos, photographs, articles, and other items; notes; wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(c)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that account and user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(d)    All "check ins" and other location information;

(e)    All IP logs, including all records of the IP addresses that logged into the account;

(f)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(g)    All information about the Facebook pages that the account is or was a "fan" of;

(h)    All past and present lists of friends created by the account;

(i)    All information about the user's access and use of Facebook Marketplace;

(j)    The types of service utilized by the user;

(k)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(l)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(m)    All records pertaining to communications between Facebook and any person regarding the user or the account and user ID, including contacts with support services and records of actions taken;

(n)     Any and all cookies associated with or used by any computer or web browser associated with the account, including the IP addresses, dates, and times associated with the recognition of any such cookie;

(o)     All records of Facebook searches performed by the account;

(p)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(q)     All photos and videos uploaded by that account and user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(r)     All location data associated with the account created, uploaded, or shared by the account;

(s)     All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests.

**Facebook is hereby ordered to disclose the above information to the United States within 14 days of the date of this warrant.**

**II.     Information to be seized by the United States**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1962(d) (Racketeering Conspiracy) involving Dominique **MAXWELL** from April 1, 2018 to July 15, 2018 and from October 7, 2019 to March 4, 2020, including, for each account or user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications between **MAXWELL** and other Gangster Disciple members, both known and unknown to investigators; as evidenced by gang terminology or symbols, use of gang monikers, content related to gang activity, structure, rules or other information referencing the Gangster Disciples.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the account(s) or user ID, including records that help reveal the whereabouts of such person(s).